KENNETH TAYLOR *vs.* COMMONWEALTH.

Suffolk. May 1, 2006. -- June 16, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Homicide. Armed Home Invasion. Joint Enterprise. Evidence,* Joint venturer.

Where the trial of indictments charging the defendant with murder in the first
  degree and armed home invasion resulted in a mistrial after the jury were
  unable to reach a unanimous verdict, the defendant could be retried as both
  a principal and a joint venturer on both charges, where the Com-
  monwealth's evidence at the first trial was sufficient to demonstrate that
  several men, at least one of whom was armed, were involved in the
  underlying home invasion during which the killing occurred, and that the
  defendant was a participant in that home invasion. [53-55]

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on January 18, 2005.

The case was heard by *Sosman,* J.

*John D. Fitzpatrick* for the defendant.

*John E. Bradley,* Assistant District Attorney, for the
Commonwealth.

GREANEY, J. Kenneth Taylor (defendant) was indicted on
charges of murder in the first degree and armed home invasion.
The murder charge was tried on a theory of felony-murder
based on the defendant's participation in an armed home inva-
sion (the predicate felony) as both a principal and a joint
venturer. On the armed home invasion charge, the Com-
monwealth also proceeded against the defendant as both a
principal and a joint venturer. The jury were unable to reach a
unanimous verdict, and a mistrial was declared.[1] The defendant

---

[1]At trial, the defendant unsuccessfully moved for required findings of not
guilty at the close of the Commonwealth's case and at the close of all the
evidence. The defendant did not provide in his record appendix copies of his
motions for required findings or those portions of the trial transcript pertain-
ing to the motions. Consequently, we are unable to state whether the motions
were generally expressed motions or whether they specifically challenged the

filed a motion to dismiss so much of the indictments as allege, or are predicated on, the theory that he acted as a participant in a joint venture. The trial judge denied the motion and the defendant sought relief from a single justice of this court pursuant to G. L. c. 211, § 3. The defendant argued to the single justice (and argues here) that because the Commonwealth offered evidence at trial only implicating the defendant as a principal, that is, as the person who shot and killed the victim, there was insufficient evidence to convict the defendant (on both indictments) on a joint venture theory, thereby barring, on double jeopardy grounds, the Commonwealth from advancing a joint venture theory at a retrial. The single justice denied the defendant's petition, and the defendant appealed. See *McGuinness* v. *Commonwealth*, 423 Mass. 1003, 1004 (1996). We affirm the judgment of the single justice.

Based on the evidence most favorable to the Commonwealth, the jury could have found the following facts. On the evening of October 24, 1999, Joseph Cooper made a telephone call to Natasha Nelson and asked her if she wanted to get some "weed" (marijuana). Cooper told Nelson that he was going to get the marijuana on Court Street in Brockton, and asked Nelson if she knew how to get there. About two hours later, Cooper picked up Nelson. Outside Nelson's residence, there were two vehicles and several people standing by them. Nelson entered a gray Maxima automobile, which was owned by Antoine Burton, whom she knew. Nelson sat in the backseat between Cooper and the defendant. Burton sat in the front passenger seat, and a Cape Verdean or Puerto Rican male was driving. A white female and a Cape Verdean or Puerto Rican male were in the other vehicle, a red Caravan.

Nelson provided directions to Court Street. Once there, the drivers of the two vehicles drove up and down the street twice. As they did, the defendant, Burton, and Cooper looked out the windows. Eventually, the two vehicles parked on a dead-end street (Peckham Street) off of, and facing, Court Street. The defendant, Burton, and Cooper got out of the automobile, leav-

sufficiency of the evidence relative to the defendant's joint venture liability. See *Commonwealth* v. *Stokes*, 440 Mass. 741, 744-745 (2004); *Commonwealth* v. *Berry*, 431 Mass. 326, 331-332 (2000).

ing Nelson alone with the driver. The male who had occupied the Caravan joined the defendant, Burton, and Cooper.

The three-story building at 216 Court Street contained one apartment on each floor. At approximately 9:30 P.M., one of the residents of the second-floor apartment, Michael Joseph Seltzer, returned to his apartment with two females, Shannon Devlin and Jamie Kisor, after having ventured out together for fast food. When they had left the apartment, Seltzer's roommate, Richard Anderlot (victim), had been inside the apartment conversing with his girl friend.[2] The victim was sixteen years old.

Seltzer, Devlin, and Kisor parked on Court Street across from Seltzer's apartment. The group walked down a driveway to the rear entrance of the building. As they approached the door, Seltzer heard "a scuffle," and people talking. The sounds came from upstairs. The group heard four or five gunshots in rapid succession followed by voices. Seltzer and Kisor ran out the back door toward the end of the driveway. Devlin ran toward the front of the building to her automobile.

Seltzer ducked behind a parked automobile. He saw four people run out the back door. They all wore dark colored clothing, and two of the people wore masks. One mask was a cotton ski mask, and the other mask was similar to the one depicted in the movie "Scream." The last person who ran out held a gun and accidentally fired a shot into the ground while running up the driveway with the others. The four people took a right onto Court Street, and ran toward Peckham Street.

Seltzer entered the building and ran to his apartment. The door was damaged and appeared as if it had been kicked in. In the living room, the victim was lying face up on the floor. Charles Matthew Rich, who lived in the third-floor apartment, was attending to the victim, who was unresponsive.

Before finding the victim, Rich had heard a loud banging noise coming from below while he had been watching television with his girl friend, Susan Taylor. They proceeded down the back stairwell and heard three or four noises in rapid suc-

---

[2] The victim's brother also shared the apartment, but was working that evening.

cession that sounded like gunfire. Rich banged into someone on the second-floor landing who was dressed in black and was wearing a mask from the movie "Scream." The person held what appeared to be a gun in the person's right hand. Rich smelled gunpowder. Rich saw two or three other individuals wearing black hooded sweatshirts descending the stairs.

Rich turned and ran upstairs. Seconds later, he returned downstairs "to make sure everyone was all right." On entering the second-floor apartment through its back door, Rich observed that the door had been severely damaged. Rich found the victim lying face down in the living room, parallel to the couch. He turned the victim over and observed two wounds. He also observed a cordless telephone on the floor underneath the victim.

As Nelson sat in the automobile, she heard a loud "pop." Soon thereafter, the defendant, Burton, Cooper, and the man from the red Caravan ran back to Peckham Street. As the defendant climbed into the automobile, he stuffed a black object with a handle into the front of his pants. The defendant and Cooper entered the backseat with Nelson, while Burton returned to the front passenger seat. The men appeared nervous and anxious. The defendant stated that he "hope[d] nobody ha[s] a mouth."

The group drove off to a woman's apartment. There, Cooper asked the defendant, "Why you do that?" The defendant responded that the victim would not let go of the telephone, and that the defendant was afraid the victim was speaking with the police. The defendant also stated that he shot the victim once, and then twice more when the victim tried to run behind the couch. Before leaving the apartment, Nelson saw the defendant enter a bedroom and place an object under a mattress.

The victim died as the result of three gunshot wounds. Police recovered three discharged nine millimeter cartridge casings from the living room of the victim's apartment. There was expert testimony that those discharged cartridge casings all had been fired from the same weapon. Police also recovered spent projectiles from the victim's body, the couch in the victim's living room, and the driveway to the victim's apartment. No weapon was ever recovered.

We need not decide whether, in circumstances such as are present here, a defendant may assert a double jeopardy claim after a mistrial when the Commonwealth's evidence is insufficient on one or more of the alternate theories of murder on which he was tried. Cf. *Commonwealth* v. *Fickett*, 403 Mass. 194, 199 n.4 (1988) (stating, in dicta, that "as a matter of common law principle . . . if a defendant demonstrates on appeal that the evidence was insufficient to warrant his conviction of a crime on a particular theory, on retrial for the same crime the prosecutor may rely on other theories justifying his conviction that were supported by the evidence at the first trial *but may not rely on a theory that should not have been given to the jury at the first trial*" [emphasis added]).[3] The issue is obviated because we agree with the single justice that the Commonwealth's evidence was sufficient to submit the case to the jury on principal and joint venturer liability on both charges.[4]

The operative law is straightforward. When a judge "declares a mistrial because of a hung jury and the defendant has moved for a required finding of not guilty, the Commonwealth must have presented evidence legally sufficient to support a conviction at the first trial, or jeopardy terminates for State law purposes, and 'the retrial of the defendant . . . would violate this State's common law principles of double jeopardy.' "[5] *Corson* v. *Commonwealth*, 428 Mass. 193, 196 (1998), quoting *Kater* v. *Commonwealth*, 421 Mass. 17, 19 (1995). "In making a determination whether the Commonwealth presented sufficient evidence to support a finding of guilt, we apply the standard articulated in *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), and used in reviewing the denial of a motion for a required finding of not guilty." *Cramer* v. *Commonwealth*, 419 Mass. 106, 109 (1994).

---

[3] The procedural background in *Commonwealth* v. *Fickett*, 403 Mass. 194 (1988), is different from that presented here. In the *Fickett* case, the jury had convicted the defendant of murder in the first degree and had not been deadlocked. *Id.* at 195.

[4] The defendant does not challenge the sufficiency of the evidence on the theory of principal liability.

[5] In these circumstances, there is no double jeopardy claim under the Fifth Amendment to the United States Constitution. See *Richardson* v. *United States*, 468 U.S. 317, 325-326 (1984).

Turning to the issue of liability as a joint venturer, the Commonwealth must prove "that the defendant was present at the scene of the crime, with knowledge that another intended to commit the crime or with intent to commit the crime, and by agreement was willing and available to help the other if necessary." *Commonwealth* v. *Stokes*, 440 Mass. 741, 745 (2004). Liability may be established by circumstantial evidence. See *Cramer* v. *Commonwealth, supra* at 110 ("Circumstantial evidence is sufficient to establish guilt beyond a reasonable doubt, even for the conviction of the highest crimes"). "The inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable." *Commonwealth* v. *Stokes, supra,* quoting *Commonwealth* v. *Brooks,* 422 Mass. 574, 577 (1996).

As explained by the single justice, the evidence in this case was sufficient to demonstrate that several men, at least one of whom was armed, were involved in the underlying home invasion during which the killing occurred, and that the defendant was a participant in that home invasion. The evidence that the defendant was the actual shooter stems from Nelson's claim that she understood the defendant to have admitted that he had been the shooter. If the jury were to discredit or reject Nelson's testimony on that point (that the defendant admitted to having been the actual shooter), they still could have credited her testimony to the effect that the defendant was a member of the group that committed the home invasion itself. That evidence, coupled with Seltzer's and Rich's testimony concerning their observations, that one of the individuals they observed outside the victim's apartment was armed, would have permitted the jury to find that one of the other individuals involved in the home invasion, apart from the defendant, had been the shooter. The evidence was sufficient to submit the case against the defendant to the jury on a joint venture theory. As has been explained, "[a] defendant need not commit an unlawful killing to be responsible for murder in the first degree under the felony-murder theory, even if the Commonwealth does not proceed under a theory of joint venture. As long as the unlawful killing occurs in connection with the predicate felony, and at substantially the same time and place, it does not matter that the

defendant did not kill the victim: he is responsible for murder." *Commonwealth* v. *Lucien*, 440 Mass. 658, 668 (2004). "Although the Commonwealth must present evidence that a principal other than the defendant committed the fatal act, the Commonwealth need not prove the identity of the actual perpetrator." *Commonwealth* v. *Stokes*, *supra* at 745.

The single justice correctly concluded that the defendant may be retried as both a principal and a joint venturer on both charges.

*Judgment affirmed.*